**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

_____

SUNTRUST EQUIPMENT FINANCE &
LEASING CORP.,

       Plaintiff/Counter-Defendant,

v.

INTERNATIONAL SPEEDWAY
CORPORATION,

       Defendant/Counter-Plaintiff.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.:

6:19-cv-01624-CEM-LRH

**INTERNATIONAL SPEEDWAY CORPORATION'S
<u>MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR A HEARING</u>**

Defendant/Counter-Plaintiff International Speedway Corporation ("ISC") moves for
summary judgment as to all counts in Plaintiff/Counter-Defendant SunTrust Equipment Finance
& Leasing Corp.'s ("STEFL") Amended Complaint (Doc. 30) pursuant to Fed. R. Civ. P. 56.

**<u>INTRODUCTION</u>**

DC Solar Solutions, Inc. and DC Solar Distribution, Inc. (collectively "DC Solar") engaged
in a multibillion-dollar Ponzi scheme that defrauded investors and business partners, including ISC
and STEFL.  Unable to secure any relief from DC Solar in bankruptcy and unwilling to
acknowledge its own failures in rushing into its transaction with DC Solar, STEFL now seeks to
blame ISC for the damages resulting from DC Solar's Ponzi scheme.

STEFL entered into a transaction with DC Solar through which it purchased and then
leased back Mobile Solar Generators ("MSGs") manufactured by DC Solar pursuant to a Master
Lease.  DC Solar then leased those MSGs to ISC through a Sublease.  Before, during, and after its

- 1 -

transaction with DC Solar, STEFL engaged exclusively with DC Solar and not ISC.  Despite this, STEFL now attempts to transfer DC Solar's fraud to ISC based on a novel theory that ISC failed to disclose to STEFL an addendum to ISC's Sublease with DC Solar.  STEFL's claim ignores the fact that ISC was under no legal duty to disclose anything to STEFL.  Furthermore, ISC had no communications with STEFL, transmitted no contract documents to STEFL, and withheld no documents that it was obligated to provide.  As with all of the contract documents, the Sublease was transmitted to STEFL by its contracting party—DC Solar.

Originally, STEFL sought to impose duties on ISC through a Sublessee Acknowledgement whereby ISC would have agreed to all of the "terms and provisions of the [Master] Lease as amended by the Amendment."  But ISC refused to sign it.  Indeed, DC Solar's counsel placed STEFL on actual notice that "ISC will not sign the Sublease Acknowledgement as their position is their business relationship is with DC Solar, not SunTrust, and their legal obligations are governed by the Sublease."  STEFL did not contact ISC regarding this unambiguous disclaimer, nor refute it in any way, but closed its transaction with DC Solar.

STEFL's losses are not based on any purported reliance on a nondisclosure by ISC, but upon DC Solar's nondisclosures as the party with whom STEFL actually had a contract.  STEFL's losses were also caused by its own failure to heed warnings by its underwriters.  STEFL ignored significant credit risks in its zeal to close the transaction with DC Solar in the third quarter of 2017 so the bank could claim over $22 million in federal renewable energy Investment Tax Credits.  It ignored over $40 million in unpaid taxes by DC Solar, which prompted senior underwriters to inquire whether the bank was DC Solar's "white knight."  It also ignored overdue accounts payable that exceeded DC Solar's receivables by more than $8,000,000.

STEFL's underwriter, Patricia Culos, assumed that ISC's Sublease offset these liabilities, but senior underwriters were unconvinced. Ms. Culos's superior, Patrick McIntyre, responded: "But DC Solar is BROKE … they have NO CASH." He recommended a direct pay arrangement from ISC to STEFL as part of the Sublease to mitigate the problem, but no one investigated that option. STEFL also required the titles to all 500 of the MSGs at closing, but DC Solar failed to provide them, consistent with its Ponzi scheme of double selling units to multiple investors. As of September 2018, nearly one year later, STEFL still did not have over 150 of the required titles.

In sum, ISC was under no duty to disclose any contract document to STEFL, and the undisputed facts show that it did not fraudulently withhold anything. The only party that disclosed those documents, or failed to, was DC Solar. STEFL's reliance on an alleged nondisclosure of ISC, which had no duty to disclose, is unreasonable as a matter of law. For these reasons, STEFL's fraudulent inducement claim is without merit and ISC is entitled to summary judgment.

STEFL's claims for ISC's breach of the Sublease and unjust enrichment equally fail as a matter of law. STEFL claims accelerated rents for the entire ten-year term of the Sublease as an assignee and third-party beneficiary under a so-called "hell or high water" clause. As recognized by several courts, "hell or high water" clauses are not so "watertight." They can be amended to permit termination of the Sublease, and thereby the "hell or high water" provision, with the sublessor's consent. DC Solar, as sublessor, unambiguously consented to termination of the Sublease in the addendum it executed. Contrary to the Amended Complaint's implication that ISC was under some duty to obtain STEFL's consent to amend its Sublease, the Sublease imposes no such requirement. ISC lawfully terminated the Sublease pursuant to its express terms, which it was contractually entitled to do. Finally, equitable relief through unjust enrichment is subject to summary judgment inasmuch as an express contract between ISC and DC Solar exists.

- 3 -

## UNDISPUTED MATERIAL FACTS

On June 2, 2017, DC Solar approached STEFL for an $80 million purchase/lease-back transaction of 500 MSGs.  Dep. of J. Robert Capps, STEFL Managing Director, at 119:23-21:5, **Ex. D-1** ("Capps Dep."); **Ex. 1** (8/7/2017 email); **Ex. 2** (6/2/2017 email).[1]  STEFL's primary incentive was a 30% Investment Tax Credit ("ITC") the bank could claim for 2017 for renewable energy assets, but STEFL needed to close the deal in the third quarter of 2017:

> So under the IRS rules, a company can only place 40 percent of its taxable assets into service in Q4, so you need to, therefore, mathematically do 60 percent in Q1, 2 and 3 combined.  So any transaction … that a tax equity investor can make in Q3 goes into the 60 percent calculation and, therefore, gives you more room under the 40 percent calculation.  So Q3 is important in that aspect.

Capps Dep. at 95:1-10.  STEFL's President, Paul Severn, also inquired:  "How is DC solar progressing – that is the pivotal transaction[?]"  **Ex. 3** (8/9/2017 email).  STEFL's capacity for more ITC transactions in the fourth quarter depended on closing this transaction in the third quarter, which drove STEFL to get the deal done before the deadline.  Capps Dep. at 94:14-97:4, 96:23-97:3 ("in the tax finance business …, if you can get a transaction done in Q3 versus Q4, we always attempt to do that if it's possible"); **Ex. 4** (6/7/2017 email).

The process began with agreement on the terms and negotiation of the documents between STEFL and DC Solar.  Capps Dep. at 104:7-105:14.  ISC was not part of those negotiations.  *Id.*  Several bank and STEFL teams investigated and approved the transaction, including underwriting, credit risk, the Asset Management Group, corporate tax (including outside tax counsel opinions), legal and the Document Management Group.  *See id.* at 118:7-119:22, 198:5-10.  The transaction required the ultimate approval of STEFL employees Mr. Severn, Lawrence Watts (National Sales Manager), James Cooper (chief underwriter), Michael Hoehn and Patrick McIntyre, underwriting

---

[1] Exs. D–1—D–5 contain deposition extracts and follow the documentary exhibits, Exs. 1—40.

officers who approved a Credit Memorandum for the transaction.  *Id.* at 109:5-10.

Lawrence Cooper, the bank's chief transactional counsel for the Equipment Finance Group, was responsible to negotiate and approve the transactional documents.  Capps Dep. at 105:15-106:13; Dep. of Lawrence Cooper, Vice President and Assoc. Gen. Counsel, at 44:7-44:21, **Ex. D-2** ("Cooper Dep.").  Attorney Cooper negotiated the contracts exclusively with DC Solar's counsel, Ari J. Lauer, and did not participate in any communications or negotiations with ISC.  Cooper Dep. at 117:2-19; Capps Dep. at 105:15-106:13, 234:2-22.  STEFL required only DC Solar—not ISC at any point in time—to provide all transactional documents to STEFL.  Capps Dep. at 150:15-22, 234:2-22.  DC Solar transmitted all of the contract documents, including the Sublease, to STEFL.  **Ex. 5** (9/27/2017 email).  ISC did not transmit any contract documents to STEFL.  *Id.*  ISC was not copied on the DC Solar transmittal emails to STEFL.  *See, e.g.*, Ex. 5; **Ex. 6** (9/25/2017 email); **Ex. 7** (9/28/2017 email); **Ex. 8** (11/3/2017 email).

STEFL did not communicate with any representative of ISC aside from a single, five-minute phone call with its sales director in August 2017.  No contract terms, underwriting terms or credit terms were discussed during the call and STEFL asked no questions of ISC.  Dep. of Frank Kelleher, ISC Managing Director of Sales, at 171:4-175:25, **Ex. D-3** ("Kelleher Dep."); Capps Dep. at 209-10 (STEFL's representatives did not even remember the call).

I.    **SunTrust Bank's Underwriting of STEFL's Investment in DC Solar's MSGs.**

In July 2017, SunTrust Bank's underwriting team conducted the underwriting for the credit risk associated with STEFL's investment.  *See* **Ex. 9** (7/6/2017 email).  That process was governed by the bank's Credit Underwriting and Approval Procedures for the Equipment Financing Group.  *See* Deposition of Patricia Culos, SunTrust Bank underwriter, at 25:24-26:24, 27:23-29:13, 30:22-31:3, 34:23-35:1, **Ex. D-4** ("Culos Dep."); *see also* **Exs. 10-12** (policies and procedures).

The proposed transaction initially required approval by the bank's "Large Transaction Review Committee."  All transactions of $10,000,000 or more in "Total Bank Exposure" were subject to such approval.  Culos Dep. at 251:12-253:25.  Once the Large Transaction Committee approved, underwriting of the DC Solar credit risk commenced in earnest.  Ms. Culos, a junior underwriter, conducted the underwriting and retrieval of DC Solar's financial records.  Cooper Dep. at 61:6-61:9.  Ms. Culos reported to Patrick McIntyre who supervised her work and conducted the underwriting as well.  *Id.* at 36:21-37:3, 61:6-61:9.  Mr. McIntyre reported to Michael Hoehn who was the chief credit officer partially responsible to approve the transaction.  Cooper Dep. at 61:10-62:3.  Final credit approval by James Cooper, Executive Vice President of the bank, was also required.  *Id.* at 108:4-15; Culos Dep. at 244:19-245:5.

On August 15, 2017, Ms. Culos conducted a site visit to the Charlotte Motor Speedway (which is not affiliated with ISC) to observe the MSGs and speak with DC Solar's personnel.  Culos Dep. at 108:9-109:10.  In attendance were Mr. Capps and Mr. Finelli, a member the bank's Asset Management Group who prepared the collateral report for underwriting.  *Id.* at 108:9-109:10, 93:12-17, 98:5-17.  A member of Mr. Capps's team, Anne Hardy, and Mr. Finelli also conducted a site visit to DC Solar manufacturing facilities in California to inspect the facilities and manufacturing processes.  Capps Dep. at 124:21-126:1.  STEFL also obtained a third-party appraisal of the MSGs from Alvarez & Marsal.  *Id.* at 85:11-19.

Ms. Culos's underwriting focused on the DC Solar entities' financials and balance sheet.  Culos Dep. at 57:23-58:17; *see* Ex. 1.  The bank required audited financial statements for 2014 through 2016, tax returns and various other due diligence materials.  STEFL also required all prior subleases between DC Solar and ISC from DC Solar, but did not ask ISC for these documents.  Capps Dep. at 171:20-173:16.  STEFL similarly required "[a]ny document evidencing services

- 6 -

between DC Solar and ISC[,] documents that would be active during the term of the Sublease" from DC Solar, but not from ISC. *Id.*; **Ex. 13** at Bermudez_SunTrust0002056 (8/12/2017 email).

STEFL also required DC Solar to execute cross-default guarantees providing that if any DC Solar entity defaulted on any obligation to the bank or any other third-party, it would constitute a default of this transaction. Cooper Dep. at 109:6-109:22, 110:10-16; **Ex. 14** (9/20/2017 email). STEFL also required the personal guarantees of DC Solar Solutions and Jeff and Paulette Carpoff. Cooper Dep. at 86:24-88:6. "Ancillary documents" from DC Solar were required also, including Board Consents authorizing the transaction, Incumbency Certificates identifying those authorized, and other materials. *Id*. at 87:4-87:21, 96:17-97:18; **Ex. 15** (8/29/2017 email).

By contrast, the underwriters neither requested nor obtained any ISC financial statements, corporate documents, Board resolutions, guarantees or any other due diligence materials to independently underwrite its finances. Cooper Dep. at 87:22-88:6, 97:25-98:14. The only material Ms. Culos received for ISC was a credit package from the bank relationship manager that reflected approximately $80 million in ISC exposure to the bank. Culos Dep. at 89:13-18. Nevertheless, Ms. Culos "believed" that the "DC Solar transaction was dependent on the cash flow of International Speedway's services debt." *Id.* at 89:19-25. However, she admitted to not understanding how or pursuant to what documents this would be the case, and testified that she never reviewed the Sublease nor knew if ISC was required to execute any documents rendering it responsible for the cash flow. *Id.* at 91:2-17, 253:10-254:14. There is no indication in the bank's credit file that Ms. Culos followed up with other bank personnel despite the fact that the bank required the equipment finance "underwriting team [to] work with the risk officers who have underwrote (sic) those other ISC transactions to make sure we on our underwriting team understood how they got comfortable with ISC originally." Capps Dep. at 132:18-23.

Finally, the Total Bank Exposure for the financing was assigned exclusively to DC Solar, and neither the bank nor STEFL assigned any portion of it directly or indirectly to ISC.  Michael Hoehn confirmed "it is DC Solar total bank exposure, not ISC."  **Ex. 16** (9/19/2017 email); Culos Dep. at 187:6-188:15.  None of the $80 million in financing exposure was attributed to ISC, but exclusively to DC Solar.  Culos Dep. at 187:23-188:15.

### A.      STEFL Ignored Significant Credit Risks.

As outlined in more detail below, eleven days before STEFL's first of two closings for its transaction with DC Solar, the underwriters discovered $43.7 million (**Ex. 17** (9/21/2017 email)) in unpaid sales and use taxes and $428,614 in unpaid franchise taxes assessed against DC Solar, which prompted Mr. McIntyre to inquire:

> How reliable are the [DC Solar] notes receivable?  Do they have any credit risk in these funds?  Conceivably, the funds are what will produce the cash to pay the IRS …. **(or will they take our $40MM to pay the IRS??)**
>
> **Mike said Cooper asked if we are their white knight?**

**Ex. 18** at STEFL_038710 (9/19/2017 email) (emphasis added).  According to Mr. Capps, "[p]er DC Solar they currently have $58MM in cash which basically covers this particular exposure." Ex. 14.  DC Solar's audited financial statements proved that representation to be false.  When Mr. McIntyre asked "where is the $40MM coming from?  They have NO cash!!!!," Ms. Culos responded "they have $133,000 as of 12/31/16 …. they got cash."  **Ex. 19** (9/18/2017 email) (emphasis in original); *see* **Ex. 20** (9/22/2017 email (item 1)).  Ms. Culos suggested that ISC has "$263.7MM cash on hand,"[2] but that comment did not address Mr. McIntyre's concerns:

> But DC Solar is BROKE … they have NO CASH… so are we saying that the mitigant is the Sublease?  How do we ensure our money gets to us with this $40MM

---

[2] Ms. Culos could not provide an answer when asked why she assumed that ISC's cash was relevant to DC Solar's tax liability.  Culos Dep. at 180:6-181:5.

- 8 -

> bill out there…. I think we need direct pay to STEFL… to avoid any chance the IRS takes their bank accounts.

Ex. 19 (emphasis and ellipses in original).  Ms. Culos's response was "This is not going to be pretty." *Id.*  STEFL was aware of direct pay options but did nothing to negotiate them and, once again, did not communicate with ISC.  Culos Dep. at 183:13-184:9; Capps Dep. at 165:21-167:18.  Nevertheless, STEFL approved the transaction and conveyed the first tranche of $40,000,000 to DC Solar.  *See* **Ex. 21** at STEFL_16101 (10/3/2018 email); **Ex. 22** (9/26/2017 email).

Ms. Culos also admitted that although the tax liabilities were on DC Solar's books, she had no idea how it would pay the assessments.  Culos Dep. at 145:1-11.  She could not recall ever receiving an adequate or sufficient answer from DC Solar.  *Id.* at 143:24-144:2.  Neither did the underwriters contact the State of California or the IRS to obtain information concerning the tax liabilities.  Culos Dep. at 207:11-208:13.  The bank's approved Credit Memorandum only reiterates the problem without any definitive solution.  *See* Ex. 21 at STEFL_16116.  Even after Mr. McIntyre approved the transaction, he stated:  "They probably have 90 day payables and the state of California waiting for us to fund this deal." **Ex. 24** (9/27/2017 email).

**B.    Wells Fargo Bank Rejected the Same Transaction.**

DC Solar previously approached Wells Fargo for this investment, but that transaction was terminated because Wells Fargo sought indemnification from ISC.  *See* **Ex. 25** (8/16/2017 email).  Ms. Culos testified that if she had known a previous bank terminated the proposed financing, that information would have been important to her underwriting, but she never asked:

> Q.   Isn't it true that you did not ever ask any representative of DC Solar for permission to call other banks about deals that were done previously?
>
> A.   I don't believe I did ask them, no.
>
> Q.   During your underwriting, were you aware that DC Solar had previously approached Wells Fargo Bank with the same transaction?

- 9 -

A. I don't remember that.

Q. It would have been important to know that Wells Fargo abandoned the transaction and terminated it prior to your underwriting, wouldn't it?

MR. SLOVENSKY:  Objection to the form. But you can answer.

THE WITNESS:  If I had been informed that Wells Fargo declined the transaction – if they declined it, that would have been helpful information.  I probably – knowing myself, I probably would have probed and pushed as to why they did that. But I don't recall being told that information.

*        *        *        *

Q. If you would have asked such a question, you would have expected an honest answer from DC Solar, correct?

A. If I had asked the question, I would have expected an honest answer, yes.

Culos Dep. at 232:20-234:11.  Although no one on the underwriting team inquired about other financial institutions as part of their due diligence, such inquiries are not uncommon as evidenced by the fact that another potential investor made just such an inquiry of STEFL in April of 2018. *See* **Ex. 26** (4/24/2018 email).  The underwriters also possessed a list of companies that purportedly leased DC Solar MSGs as of January 31, 2017, including T-Mobile USA, Inc. and other race tracks not affiliated with ISC, but did nothing to contact those organizations or confirm those leases.  *See* **Ex. 27** (1/31/2017 DC Solar Distribution Lease Schedule); Culos Dep. at 248:3-249:1.  The lease schedule reflected that ISC purportedly leased 1,000 units from DC Solar, but a cursory follow-up with ISC would have revealed that this representation was false.  *See* Ex. 27.

**C.    DC Solar's Accounts Payable Exceeded Its Receivables by Millions of Dollars.**

DC Solar's accounts payable totaled $9,137,587 as of September 22, 2017, $7,284,600 of which was greater than 90 days due.  *See* **Ex. 28** (9/22/2017 email).  DC Solar's accounts receivable only totaled $647,482 with only $133,000 cash on hand.  *Id.*  Culos's email regarding the issue alludes to an undisclosed source giving DC Solar a $50 million line of credit in exchange for a security interest in all of its assets, but there is nothing in the underwriter's credit file

- 10 -

reflecting an actual line of credit in any amount.  *See id*.; Ex. 21 at STEFL_16114.  The Credit

Memorandum only provides that DC Solar is "in the process of working with a bank that has

offered a $50MM line of credit" and that the lack of a line of credit was somehow mitigated by

DC Solar's purported cashflow.  *See* Ex. 21 at STEFL_16114.  The bank was never identified nor

contacted.  Once again, despite the underwriters' concerns, nothing in the Credit Memorandum

approving the transaction definitively resolved the problem.  *Id.*; *see* Culos Dep. at 192:16-196:6.

> **D.     STEFL Failed to Secure Titles to Its Collateral as Required for Closing.**

STEFL required DC Solar to transfer titles to all 500 of the MSG units (including trailers)

to it at closing as the collateral for the transaction.  The bank's underwriter testified as follows:

> Q.  Who would have the title to those vehicles once the transaction was consummated?
>
> A.  At closing, SunTrust should have had all those titles because that was securing our loan lease, whatever it was.  [T]he security interest was the trailers and the solar units.
>
> Q.  So the collateral, if you will, was the trailers, and so SunTrust should have had all the titles at closing to those trailers, correct?
>
> A.  Correct.
>
> Q.  And the solar units that were part of those trailers would have had to have serial numbers that matched to your inventory filings, correct?
>
> A.  Correct.
>
> Q.  And that would be a closing requirement as well, to make sure that you have proper collateral.  Yes?
>
> A.  To the best of my knowledge, that is a closing requirement, that my transaction is fully secured.

Culos Dep. at 122:12-123:9.  Ms. Culos considered these "inventory filings … crucial" to the

closing.  **Ex. 29** (8/17/2017 email).  However, STEFL failed to secure the titles at closing despite

its own closing requirements.  Culos Dep. at 123:10-16.  Indeed, as of a year after closing, STEFL

secured only 343 of the 500 titles required at closing.  *Id.* at 212:10-20; **Ex. 30** (9/24/2018 email).

- 11 -

**E.      STEFL's "Credit Call" with DC Solar Representatives.**

On or around September 27, 2017, Culos, McIntyre and Hoehn conducted a "credit call" with DC Solar in order to ask all of their questions and resolve their underwriting issues.  *See* Ex. 24.  The call "takes place after you review the financial statements and have questions," and Ms. Culos prepared written questions so the bank could fully understand the financial position of the company.   Culos Dep. at 98:18-101:24, 100:20-22; Ex. 20.   Culos testified that DC Solar's financial position was critical to understanding its ability to repay the debt.  Culos Dep. at 101:13-25.  "If I don't fully understand the financial position of the company, my underwriting will not be accurate…. I don't guess financial positions of companies." *Id.* at 101:13-101:20.

The underwriters never obtained a clear understanding of DC Solar's cash on hand or how it would pay $40 million in tax liability.  Although the "credit call" is standard operating procedure to understand the financial position of the company, it did not occur until the day before closing, after the underwriters approved the Credit Memorandum.  *See id*. at 202:22-203:07; Ex. 24. STEFL did not conduct any credit underwriting call with ISC, nor did ISC participate in the bank's credit call with DC Solar.  Culos Dep. at 101:25-102:17.  Culos admitted that nothing prevented bank personnel from contacting ISC directly to address underwriting issues or questions, but she did not do that or recommend it to anyone else.  *Id.* at 104:7-105:3.

**F.      The "Sublessee Acknowledgement" and STEFL's Knowledge that ISC Did Not Accept or Acknowledge Any Obligations Under the Master Lease.**

One of STEFL's required closing documents on STEFL's Closing Checklist was a "Subleasing Consent and Amendment" executed by DC Solar.  (Am. Compl. Ex. E, Doc. 30-5). **Ex. 31** (Closing Checklist, item no 15); Cooper Dep. at 91:22-92:3 (quoting Dep. Ex. ISC 47, attached hereto as Ex. 15), 114:22-115:11 (confirming that Consent and Amendment is a closing

document); **Ex. 32** (9/26/2017 and 9/27/2017 emails identifying Sublessee Acknowledgement as required closing document and requesting "please forward signature pages to be held in escrow pending release at closing"). Part of the Subleasing Consent and Amendment is a "Sublessee Acknowledgement" that DC Solar was to have ISC sign. (*See* Am. Compl. Ex. E, Doc. 30-5 at 5). DC Solar and STEFL exchanged versions of this document and the other closing documents weeks prior to their first closing, but neither party provided the Sublessee Acknowledgement (or any other closing document for the STEFL/DC Solar transaction) to ISC except this sole document on September 26, 2017. Cooper Dep. at 91:21-92:3, 92:9-92:22; Ex. 15; **Ex. 33** (9/6/2017 email). The Sublessee Acknowledgement would have expressly subjected ISC to all of the terms, conditions and obligations of the Master Lease:

> As required by that certain Subleasing Consent and Amendment, dated as of September 27, 2017 (the "Amendment"), by and between DC SOLAR DISTRIBUTION, INC. ("Customer") and SunTrust Equipment Finance & Leasing Corp, (together with its successors and assigns, "STEFL"), each **Sublessee acknowledges and agrees to the terms and provisions of the Lease as amended by the Amendment, and further acknowledges and agrees that: … Sublessee shall perform all of its obligations under any Sublease Agreement in accordance with the terms and provisions of the Amendment**; [and] the rights of each Sublessee in and to the Equipment shall be subject and subordinate to the rights of STEFL under the Lease as provided herein, and Sublessee shall not assert or claim any right, title or interest as the owner or holder of legal or equitable title to any Equipment….

(Am. Compl. Ex. E, Doc. 30-5 at 5 (emphasis added)). It is undisputed, however, that ISC refused to sign the Sublessee Acknowledgement:

> Q. So the sublessee acknowledgment, just so we're all clear for the record, was never signed by International Speedway Corporation. Is that true?
>
> A. Not to my knowledge, no.
>
> Q. Okay. You have never seen in any capacity a signed sublessee acknowledgment by International Speedway Corporation, have you?
>
> A. I have not.

- 13 -

Cooper Dep. at 123:3-123:11.  DC Solar's attorney, Ari Lauer, also notified STEFL that "ISC will not sign the Sublease Acknowledgement as their position is their business relationship is with DC Solar, not SunTrust, and their legal obligations are governed by the Sublease."  Ex. 32.  Attorney Cooper admitted the same in his deposition:

> Q.  Mr. Lauer placed you and all of these SunTrust and STEFL representatives on notice at 11:39 a.m. on September 27 that ISC will not sign the sublessee acknowledgment, as their position is their business relationship is with DC Solar, not SunTrust, and their legal obligations are governed by the Sublease. Correct?
>
> A.  Correct.
>
> Q.  ISC was informing you that it didn't have obligations to STEFL; its business relationship was with DC Solar, through Mr. Lauer here.
>
> A.  Well, Mr. Lauer was informing us of that. We had no direct conversations or communications with ISC.
>
> Q.  Right.  Mr. Lauer was informing you of ISC's position on that issue.
>
> A.  Correct.  Correct.

Cooper Dep. at 127:5-127:21.  Attorney Lauer copied virtually all of the STEFL and DC Solar representatives involved in the transaction on the email.  *See* Ex. 32; Cooper Dep. at 126:20-25. As with every other email communication between DC Solar and STEFL, however, ISC was not copied.  Ex. 32.  Moreover, on notification of ISC's refusal to subject itself to these terms and conditions, Mr. Cooper did not request to speak with ISC regarding the matter.  Cooper Dep. at 127:22-24, 138:22-139:5.  Cooper provided the following reason:

> Q.  You had no communications with any representative of ISC?
>
> A.  Correct.  As is our practice.  We do not-we do not inject ourselves into third-party contracts.
>
> Q.  Why not?
>
> A.  Well, because we don't want to interfere with our customer's business.
>
> Q.  And their contractual relationships with somebody else?
>
> A.  Correct.
>
> Q.  You don't want to interfere with that?

- 14 -

A.  Correct.

*Id.* at 138:22-139:16.  STEFL did not involve itself in the contract between DC Solar and ISC because that was "an arrangement between DC Solar and International Motor Speedway.  Our job was to look at it and determine that it was acceptable to us."  *Id.* at 151:10-13.

Nowhere in the communications between Mr. Cooper and Mr. Lauer on September 27, 2017, did Mr. Cooper ever contradict ISC's position (as presented by Mr. Lauer) that ISC was not contractually obligated to STEFL because ISC's contract was with DC Solar, not STEFL:

> Q.  So to simplify it, you did not respond in writing and say, ["]Wait a minute, we need to be clear; ISC has obligations, legal obligations, to STEFL.["]  Correct?
>
> MR. SLOVENSKY:  Object.  Object to the form.  You can answer.
>
> A.  I did not.

*Id*. at 127:25-129:1.  Instead, Mr. Cooper informed Mr. Lauer that ISC's refusal to execute the Sublessee Acknowledgement was "problematic" because it was Mr. Cooper's opinion that the "sublessee acknowledgement & agreement that is included with the subleasing consent agreement is a comprehensive and complete restatement of the sublessee's obligations and the sublessee's agreement to perform the same."  **Ex. 34** (9/27/2017 email); Cooper Dep. at 132:22-133:5.

Mr. Cooper was concerned enough about the unsigned acknowledgement that he sought advice from the bank's outside counsel who drafted it.  Cooper Dep. at 157:9-160:18.  Attorneys Cooper and Lauer conducted teleconferences (without ISC) throughout the day and Mr. Lauer assured Mr. Cooper that he did not need ISC's signature on the Sublessee Acknowledgement.  *Id.* at 136:5-20, 140:25-141:5.  As to these conversations, Mr. Cooper testified as follows:

> Q.  Now, you had already seen versions of the Sublease prior to September the 27th of 2017.  Correct?
>
> A.  Correct.

Q. Did Mr. Lauer describe to you somehow how the Sublease was changed or amended or the language was different in order to address this issue that ISC would not sign the consent?

A. He [Lauer] went over certain provisions that gave me comfort that we could accept the Sublease without the acknowledgment.

*Id.* at 136:17-137:2.  Cooper never spoke with ISC and ISC never made any representations at any time whatsoever—except, through DC Solar, that it would not execute the acknowledgement because ISC <u>was not</u> contractually obligated to STEFL.

Based on Mr. Lauer's representations, Mr. Cooper proposed a "work around" that ISC "simply acknowledge (via a signature block) the subleasing consent agreement." Ex. 34.  In other words, Cooper requested that ISC "acknowledge the acknowledgement." Cooper Dep. at 135:22-136:4, 138:6-12.  However, ISC declined to sign the Sublessee Acknowledgement in any form that might implicitly be construed as its consent to the terms or conditions of the Master Lease. *Id.* at 138:13-16.  Mr. Cooper testified that Mr. Lauer explained to him that ISC would not sign the acknowledgement in any form because ISC did not want to be contractually bound or tied to STEFL. *Id.* at 144:6-13.

Attorney Lauer then suggested the letter attached to the Amended Complaint as Exhibit K. That letter only acknowledges that the MSGs are leased to DC Solar by STEFL:

International Speedway Corporation ("ISC") acknowledges that the Solar Equipment (as that term is defined in the September 27, 2017 Mobile Solar Equipment Sublease between DC Solar Distribution, Inc. and ISC ("Sublease")) is being leased by SunTrust Equipment Finance & Leasing Corp. to DC Solar Distribution, Inc. and then Subleased by DC Solar Distribution, Inc. to ISC pursuant to the Sublease.

(Am. Compl. Ex. K, Doc. 30-11).  Ex. 34.  The letter was provided to STEFL with a copy of the signed Sublease by Jeff Carpoff on behalf of DC Solar.  Cooper Dep. at 152:6-24; Ex. 5.  ISC was not copied on Mr. Carpoff's email to STEFL and no one at ISC transmitted any lease document—

- 16 -

including the Sublease or the letter—to STEFL.  Cooper Dep. at 152:25-153:2.  Consistent with each and every other communication, all lease and contract documents were transmitted to STEFL by its contracting party, DC Solar.  None of the closing documents for the DC Solar transaction with STEFL were conveyed to, or from, ISC at all.  *See* **Ex. 35** (11/02/2017 email).  Throughout the entire underwriting and closing process, not one STEFL representative communicated directly with any ISC representative save one five-minute phone call in August 2017.

        **G.**      **STEFL's Closings and the Separate Contract Documents.**

STEFL closed its transaction with DC Solar in two tranches on September 28, 2017, and November 3, 2017.  Cooper Dep. at 155:12-165:4; Capps Dep. at 76:1-12.  STEFL and DC Solar executed the Master Lease on September 25, 2017.  Am. Compl. Ex. A, Doc. 30-1;  Ex. 6.  STEFL closed the first tranche of financing and executed Equipment Schedule No. 001 on September 28, 2017.  (Am. Compl. Ex. B, Doc. 30-2; Am. Compl., Doc. 30 ¶ 21).  Ex. 7.  They executed the first Subleasing Consent and Amendment on that date as well.  Am. Compl. Ex. E, Doc. 30-5.  STEFL and DC Solar closed the second tranche of their transaction and executed Equipment Schedule No. 002 on November 3, 2017.  Am. Compl. Ex. B, Doc. 30-2; Am. Compl. ¶ 22.  Ex. 8.  DC Solar also executed the Subleasing Consent and Amendment in connection with the closing of this tranche of financing on November 3, 2017.  Am. Compl. Ex. F, Doc. 30-6.

On September 27, 2017, DC Solar and ISC entered into the Sublease.  (Am. Compl. Ex. D, Doc. 30-4).  DC Solar and ISC also entered into an Addendum to Mobile Solar Equipment Sublease ("Addendum 1") on September 27, 2017, pursuant to paragraph 20 of the Sublease, which provides that the Sublease may be modified in a writing, signed by both DC Solar as sublessor and ISC as sublessee.  (*Id.*, ¶ 20; Am. Compl. Ex. J, Doc. 30-10).  On March 6, 2018, ISC and DC Solar entered into a second Addendum to Mobile Solar Equipment Sublease ("Addendum 2").

- 17 -

(Am. Compl. Ex. L, Doc. 30-12).   Paragraph 2 of Addendum 2 amends the Sublease to provide that DC Solar shall pay when due all license fees, registration fees, taxes and similar charges.  (*Id.*).

### H.    DC Solar Ceases All Operations and All Contracts Are Terminated.

On December 18, 2018, the FBI conducted a raid on DC Solar's offices and the Carpoffs' home, and seized company computers and assets as part of an ongoing investigation of fraudulent activities associated with a potential Ponzi scheme by the company and its principals, Jeff and Paulette Carpoff.  All of DC Solar's bank accounts were frozen, and the company shut down and ceased all operations. *See* Cooper Dep. at 166:24-167:9; **Ex. 36** (1/03/2019 email).  It defaulted on all of its contracts with both STEFL and ISC as of that date, and no payments were made by the company thereafter.  On January 15, 2019, ISC delivered a notice to DC Solar that it was in breach of the Sublease.  **Ex. 37** (1/15/2019 letter).  On January 28, 2019, STEFL issued to DC Solar a "notice terminating the solar equipment lease contracts."  **Ex. 38** (01/28/2019 letter attached to transmittal email to Dan Briggs); Cooper Dep. at 189:3-16.

On February 4, 2019, DC Solar and its affiliates filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada.[3]  *See In re Double Jump, Inc.,* Bankr. Case No. BK-19-50102-BTB (Bankr. D. Nev. 2/7/2019) (consolidated).  On February 22, 2019, ISC filed a Motion for Relief from Stay in that proceeding to permit it to immediately terminate the Sublease as a result of DC Solar's shutdown and complete breach of all of its contracts with ISC.  *Id.*, Dkt. No. 174.  The Bankruptcy Court granted that motion in an Order issued on May 14, 2019 (Dkt. No. 722) and held that "effective on May 21, 2019, the contracts and leases that were the subject of the ISC Motion are deemed

---

[3] The case was converted to a Chapter 7 bankruptcy on March 22, 2019.  *See In re Double Jump, Inc.*, Bankr. Case No. BK-19-50102-BTB (Bankr. D. Nev.), Dkt. No. 438.

rejected and ISC and the ISC Entities are granted relief from the automatic stay." *Id.* On May 22, 2019**,** ISC terminated the Sublease and all other contracts with DC Solar. **Ex. 39** (5/22/2019 letter).

## ARGUMENT

### I.     **STEFL's Fraudulent Inducement Claim (Count IV) Fails as a Matter of Law.**

STEFL claims that it was fraudulently induced to enter into its sale/leaseback transaction with DC Solar based on ISC's alleged nondisclosure of Addendum 1 to the Sublease.   The Amended Complaint alleges that ISC "deliberately omitted material terms that ISC has admitted were 'part of the bargain struck between the parties concerning' the Sublease, and instead included them in a separate document not disclosed to STEFL.   That second document (the "Omitted Terms"), which DC Solar and ISC referred to as "Addendum #1," was signed on the very day the Sublease was signed."  (Am. Compl., Doc. 30 ¶ 8 (emphasis removed)).  The Amended Complaint further alleges that "ISC omitted those terms from the version of the Sublease *it communicated to STEFL and in the letter it communicated to STEFL that described the terms on which ISC would Sublease the MSGs from DC Solar*."  (*Id.*, ¶  9 (emphasis added)).

STEFL's claim fails as a matter of law for several reasons.  First, inasmuch as ISC and STEFL had no preexisting relationship—fiduciary, contractual or otherwise—and did not engage in any negotiations with one another, ISC was under no legal duty to disclose anything to STEFL. Absent a recognized duty to disclose material facts, ISC cannot be found liable for nondisclosure of such facts as a matter of law.  Second, DC Solar is the only party that was required to, and did, transmit contract documents to STEFL pursuant to the terms of its Master Lease.  ISC neither conveyed nor transmitted any contract documents to STEFL at any time, and never withheld any contract documents from STEFL.  As repeatedly admitted by STEFL's witnesses, no one ever communicated with ISC in any way about the contracts.  If anyone withheld anything from STEFL,

- 19 -

it was the party with whom it contracted to provide all such documents—DC Solar. Third, the undisputed facts establish that ISC did not accept or acknowledge direct contractual responsibilities to STEFL, which was notified that ISC disclaimed any responsibilities, representations or warranties prior to STEFL's first closing. Therefore, STEFL's reliance, if any, on a supposed nondisclosure by ISC was unjustified as a matter of law in light of the undisputed facts of which STEFL was on notice.

### A. The Choice-of-Law Governing STEFL's Fraudulent Inducement Claim.

California law governs the Sublease according to its terms. (Am. Compl. Ex. D, Doc. 30-4 ¶ 20). New York law governs the Master Lease according to its terms. (Am. Compl. Ex. A, Doc. 30-1 ¶ 20). In a diversity action, a federal court applies the choice-of-law principles of the state in which it sits. *Sack v. Cessna Aircraft Co.*, 676 Fed. Appx. 887 (11th Cir. 2017). Thus, Florida's conflict-of-law rules determine which state's substantive law governs STEFL's fraudulent inducement claim. In this regard, choice-of-law provisions in the contract governs the claim. *Mazzoni Farms, Inc. v. E.I. Dupont De Nemours & Co.*, 761 So.2d 306, 309 (Fla. 2000). Inasmuch as the Amended Complaint alleges that ISC fraudulently induced STEFL to enter into the "Purchase/Lease/Sublease transaction with DC Solar and ISC," either California or New York law may apply. (Am. Compl., Doc. 30 ¶ 132. *See* Order on Mot. to Dismiss, Doc. 69 at 11-12). Consequently, both California and New York law are addressed.

### B. Fraud Based on Nondisclosure Requires a Duty to Disclose, and ISC Had No Such Duty.

The elements of a fraud claim based on nondisclosure are that "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and

would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *RSB Vineyards, LLC v. Orsi*, 15 Cal. App.5th 1089, 1096-97 (Cal. App. 1st 2017) (internal citation omitted); *Hogan Willig, PLLC v. Kahn*, 145 A.D.3d 1619, 1620-21 (NY 4th Dept. 2016) (elements are "a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission and injury [and] a duty on the part of the defendant to disclose") (internal citation omitted).

Plaintiff must show that "(1) the defendant failed to disclose a material fact which he knew or believed to be true; and (2) the defendant had a duty to disclose that fact." *Belasco v. Wells*, 234 Cal. App.4th 409, 424 (Cal. App. 2d 2015). New York law similarly requires the existence of a duty to disclose for fraud based on nondisclosures. *Sehera Food Servs., Inc. v. Empire State Bldg. Co., LLC*, 74 A.D.3d 542, 543 (NY 1st Dept. 2010) (claims for fraudulent inducement and concealment are not viable where "there is no duty to disclose in a nonfiduciary, arm's length transaction").

"Liability cannot arise from silence unless the law commands the defendant to speak. A duty to speak may arise in four ways: it may be directly imposed by statute or other prescriptive law; it may be voluntarily assumed by contractual undertaking; it may arise as an incident of an existing relationship between the defendant and the plaintiff; and it may arise as a result of other conduct by the defendant that makes it wrongful for him to remain silent." *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC*, 162 Cal. App.4th 858, 867 (Cal App. 6th 2008). A duty to disclose may arise if the defendant both has knowledge of a material fact that is "peculiarly within" the defendant's knowledge and the information could not have been discovered by the plaintiff

- 21 -

"through the exercise of ordinary intelligence." *Jana L. v. West 129th St. Realty Corp.*, 22 A.D.3d 274, 278 (NY 1st Dept. 2005) (finding no duty to disclose as a matter of law where the plaintiff failed to inquire of the defendant about the allegedly undisclosed fact).

In this case, ISC was not under any duty, contractual or otherwise, to disclose anything to STEFL. Furthermore, it was DC Solar, not ISC, which undertook a duty to disclose to STEFL. ISC did not know, and could not know, what DC Solar did or did not disclose to STEFL. ISC did not conceal anything from STEFL.

## C. ISC Did Not Transmit Any Contract Documents Regarding the Sublease to STEFL and, Therefore, Did Not Fraudulently Withhold Any Such Documents.

The record is replete with undisputed evidence establishing that ISC did not communicate anything regarding the Sublease, nor transmit any of the Sublease contract documents, to STEFL because ISC was under no legal duty to do so. DC Solar's Master Lease—to which ISC is not a party—imposed that duty on DC Solar. Among the representations and warranties that DC Solar made to STEFL in its Master Lease was the representation that "no information contained in any Lease Document, financial statement, or any written statement furnished by or on behalf of Lessee under any Lease Document, or to induce Lessor to execute the Lease Documents, contains any untrue statement of material fact or omits a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made…." (Am. Compl. Ex. A, Doc. 30-1 ¶ 4). The Subleasing Consent and Amendment executed solely between STEFL and DC Solar (as "Customer") also contained the following representations made exclusively by DC Solar:

> [E]ach Sublease Agreement is and shall be genuine and executed by the parties identified therein, which parties shall be duly authorized to execute such Sublease Agreements; (iii) each Sublease Agreement is and shall be the exclusive Sublease Agreement executed in connection with the use and possession of the Equipment

- 22 -

by the Sublessee and for the time period identified therein; (iv) all information in each Sublease Agreement or supplied by Customer to STEFL in connection with each Sublease Agreement is and shall be true and correct….

(Am. Compl. Ex. F, Doc. 30-6 ¶ 3).

ISC was not a party to the Master Lease executed by STEFL and DC Solar or the disclosure obligations imposed on DC Solar.  Neither was ISC a party to the Subleasing Consent and Amendment executed solely by DC Solar nor the disclosure obligations it imposed on DC Solar. The undisputed facts further reflect that ISC did not execute a Sublessee Acknowledgement that would have subjected it to "terms and provisions of the Lease as amended by the Amendment." (*See* Am. Compl. Ex. E, Doc. 30-5).  Therefore, ISC provided no representations or warranties to STEFL of any kind, including particularly the responsibility to disclose any Sublease documents.

The allegation in the Amended Complaint that "ISC omitted those terms from the version of the Sublease *it communicated to STEFL*" (Am. Compl., Doc. 30 ¶ 9 (emphasis added)) is contrary to the undisputed facts.  DC Solar is the only party that communicated the Sublease documents to STEFL in any way, shape or form.  Moreover, STEFL's communications about the terms and conditions of all of the contract documents were with DC Solar's counsel, Ari Lauer, not ISC.  STEFL's witnesses repeatedly acknowledged that its representatives had no communications with any ISC representative about any Sublease terms or documents at any time, and ISC conveyed no contract documents to STEFL.  Exs. 5-8.  ISC was under no duty to do so.

To the extent less than the total package of Sublease contract documents was fraudulently withheld from STEFL, that fraud was committed solely by DC Solar in contravention of its representations, warranties and obligations.  STEFL cannot point to any evidence in this record reflecting any direct communication from ISC whereby it either communicated any contract document or term to STEFL or made any representation or warranty to STEFL that it was obligated

- 23 -

to, and did, disclose all of the Sublease contract documents to STEFL.  Indeed, ISC was not even copied on the emails between DC Solar and STEFL whereby DC Solar conveyed those documents to STEFL. Exs. 5-8.

The Amended Complaint's allegation that ISC omitted the terms of the Sublease addendum (Addendum 1) from the "letter it communicated to STEFL that described the terms on which ISC would Sublease the MSGs from DC Solar" is equally belied by the undisputed facts.  (Am. Compl., Doc. 30 ¶ 9).  STEFL was placed on actual notice that ISC would not execute the Sublessee Acknowledgement whereby it would have been obligated to such representations and disclosure obligations under the Master Lease or the Lessee Consent and Amendment.  Even when STEFL asked ISC to "acknowledge the acknowledgement," ISC did not do so in order to avoid any implication that it was responsible for the completeness of information that DC Solar conveyed to STEFL under its contract.  STEFL was also placed on notice by DC Solar's counsel that "ISC will not sign the Sublease Acknowledgement as their position is their business relationship is with DC Solar, not SunTrust, and their legal obligations are governed by the Sublease."  Ex. 32.  STEFL's counsel testified that he had "no direct conversations or communications with ISC" about this or any other contract matter.  Cooper Dep. at 127:5-127:21.  Once again, virtually every DC Solar and STEFL representative was copied on these emails, but no one from ISC was included.

The undisputed facts also show that the letter which allegedly "described the terms on which ISC would Sublease the MSGs from DC Solar" did nothing of the kind, and certainly did not impose some heretofore nonexistent disclosure duty on ISC.  After ISC's position was made clear to STEFL, this letter stated only the obvious existence of a Master Lease and Sublease and nothing more.  ISC acknowledged only that the equipment was "leased by SunTrust Equipment Finance & Leasing Corp. to DC Solar Distribution, Inc. and then Subleased by DC Solar

- 24 -

Distribution, Inc. to ISC pursuant to the Sublease."  (Am. Compl. Ex. K, Doc. 30-11).  Ex. 34. This letter does not describe any terms of the Master Lease or Sublease.  More to the point, it does not contain any representation or warranty requiring ISC to disclose any Sublease documents to STEFL.  The letter does nothing more than acknowledge the existence of a Master Lease to which ISC was not obligated and a Sublease.  In short, STEFL needed something (anything) to check the box on its closing list, and its attempt to have this Court now read obligations into that innocuous letter is contrary to the undisputed facts.

The reason ISC declined to obligate itself to STEFL, or to make representations or warranties obligating it to disclose contract documents to STEFL, is no more poignantly explained than by STEFL's own transactional counsel.  Just as it is STEFL's practice not to "inject itself into third-party contracts" or "interfere with our customer's business" and contractual relationships, so too did ISC refuse to inject itself into DC Solar's separate business and contractual relationship with STEFL.  Cooper Dep. at 138:22-139:16; Capps Dep. at 151:10-13.  DC Solar's counsel made that position abundantly clear to STEFL when he communicated to STEFL's attorney that ISC would not execute the Sublessee Acknowledgement creating any such obligations.  ISC did not know what DC Solar did or did not disclose to STEFL as part of the contractual relationship between DC Solar and STEFL and cannot be held responsible for what DC Solar did or did not disclose to STEFL as part of that relationship.

**D.      ISC was under no legal duty to disclose anything to STEFL, and the Sublease Integration Clause Does Not Substantiate a Claim for Fraudulent Inducement.**

ISC was under no statutory, contractual, or common law duty to disclose the Sublease or either addendum to STEFL.  STEFL and ISC had no contractual relationship of any kind prior to—or after for that matter—STEFL's contract with DC Solar.  Plaintiff's Amended Complaint

- 25 -

does not even allege the duty element despite the fact that the fraudulent inducement claim is founded entirely upon ISC's allegedly intentional nondisclosure of the addendum to its Sublease.

Plaintiff's fraud claim is not saved by an integration clause in ISC's Sublease.  It is undisputed that the integration clause is an acknowledgement between the contracting parties, DC Solar and ISC, not a representation of the completeness of documents DC Solar provided to STEFL.  As with any standard integration clause, the instant one provides that the Sublease is the contract between the parties and "supersede[s] all prior oral and written discussions or agreements."  (Am. Compl. Ex. D, Doc. 30-4 ¶ 20).  This provision is simply a confirmation between the two contracting parties that neither will attempt to rely upon oral negotiations or discussions outside their contract.  The addendum executed contemporaneously with the Sublease became part of that contract.  The integration clause is not a representation to STEFL that the Sublease was not, or could not be, amended, and in fact the form of the Sublease that STEFL approved explicitly provided that it could be amended.  The research discloses no case in New York or California where an integration clause forms the basis of a fraud claim in connection with contract amendments.  Furthermore, courts are clear that a statement must be "conceptually distinct from the contract" and "beyond a broken contractual promise" in order to support liability for fraudulent inducement.  *Food Safety Net Services v. Eco Safe Systems USA, Inc.*, 209 Cal. App.4th 1118, 1131-32 (Cal. App. 2d 2012) (internal citation omitted); *J.E. Morgan Knitting Mills, Inc. v. Reeves Bros., Inc.*, 243 A.D.2d 422, 423 (NY 1st Dept. 1997) (plaintiff cannot recover in fraud for claim premised on contractual warranty statements).  Reliance on a stereotypical integration clause is a contrivance after the fact in order to create an erroneous impression that ISC affirmatively represented something to STEFL.  Again, if there was any failure to provide the relevant contract documents to STEFL that failure—and duty—was DC Solar's alone.

- 26 -

**E.     STEFL's Reliance on an Alleged Nondisclosure by ISC Was Unreasonable and Unjustified in Light of STEFL's Actual Knowledge that ISC Did Not Assume Any Obligation to Disclose Facts or Documents to It.**

STEFL was placed on actual notice that ISC would not execute the Sublessee Acknowledgement; did not agree to any representations or warranties to STEFL; and did not assume any duty to communicate contractual terms or documents to STEFL inasmuch as ISC's "legal obligations are governed by the Sublease."  Ex. 32.  STEFL closed its transaction with DC Solar anyway.  STEFL did not communicate with ISC directly to obtain documents directly from ISC, but relied exclsuively on representations and warranties made by DC Solar.  STEFL admits that nothing prevented it from confirming those representations with ISC directly but it did not.  Even if STEFL established actual reliance on an alleged nondisclsoure by ISC by clear and convincing evidence, such reliance was unreasonable and unjustified as a matter of law.

Fraudulent inducement requires reasonable or justifiable reliance.  *United Guar. Mortg. Indem. Co. v. Countrywide Financial Corp.,* 660 F.Supp.2d 1163, 1189 (C.D. Cal. 2009) (internal citation omitted); *Ventur Group, LLC v. Finnerty*, 68 A.D.3d 638, 639 (NY 1st Dept 2009).  Reliance is judged under an objective standard based on the plaintiff's intelligence, sophistication and information.  *United Guar. Mortg. Indem*., 660 F.Supp.2d. at 1189.  "Justifiable reliance does not exist where a party has the means to discover [a falsehood] by the exercise of ordinary intelligence, and fails to make use of those means." *Tanzman v. La Pietra*, 8 AD 3d 706, 707 (NY 3d Dept. 2004).  If "the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery."  *Hoffman v. 162 North Wolfe, LLC*, 228 Cal. App.4th 1178, 1194 (Cal. App. 6th 2014).

Alleged reliance also is "less reasonable when the parties are more sophisticated." *United Guar. Mortg. Indem.*, 660 F.Supp.2d at 1995.   Courts take into account the plaintiff's

- 27 -

sophistication in determining whether its reliance was justifiable. *Stuart Silver Assocs., Inc. v. Baco Development Corp.*, 245 A.D.2d 96, 98-99 (NY 1st Dept. 1997) (noting that plaintiffs' reliance was unreasonable, in part, because plaintiffs were "sophisticated investors"). Courts also consider whether parties were represented by counsel because a "party cannot claim reliance on a misrepresentation when he or she could have discovered the truth with due diligence." *KNK Enterprises, Inc. v. Harriman Enterprises, Inc.*, 33 A.D.6d 872 (NY 2d Dept. 2006).

STEFL and SunTrust Bank are extremely sophisticated parties which employed a team of underwriters, dedicated in-house counsel with some forty years of equipment financing and leasing experience, and outside counsel with whom STEFL's attorney conferred regarding ISC's refusal to sign the Sublessee Acknowledgement. It is beyond peradventure that STEFL possessed the means to discover the purported nondisclosure by the exercise of ordinary intelligence and diligence but failed to do so. STEFL's supposed reliance on any supposed nondisclosure by ISC is objectively unreasonable under these circumstances particularly when STEFL was on actual notice that ISC would not accept any such contractual responsibilities. STEFL's counsel was concerned enough about these issues to consult its outside counsel who drafted the Sublessee Acknowledgement, but never communicated with ISC despite the fact that nothing prevented it from doing so. STEFL did not rely on any representation or warranty by ISC because ISC did not make any. To the extent that STEFL contrives a claim that it relied upon a nondisclosure when ISC unequivocally disclaimed any responsibility to disclose or represent anything to STEFL, that purported relaince is manifefstly unreasonable as a matter of law.

**II.    STEFL Possesses No Greater Rights as an Assignee or Third-Party Beneficiary of the Sublease than DC Solar and, Therefore, Cannot Enforce a "Hell or High Water" Provision as a Result of DC Solar's Absolute Breach of All of Its Contracts and ISC's Termination of Those Contracts.    Thus, STEFL's Breach of Contract and Declaratory Relief Claims (Counts I and II) Fail as a Matter of Law.**

- 28 -

STEFL's Amended Complaint claims that it is an assignee and expressed third-party beneficiary of the Sublease pursuant to paragraph 19 of that contract. (Am. Compl., Doc. 30 ¶¶ 30, 44). As such, STEFL alleges that it stands in DC Solar's shoes as the sublessor and alleges that it may take advantage of a so-called "hell or high water" clause in the Sublease to require ISC to pay it the entire balance of the rent payments through the original ten year term. STEFL is incorrect.

As a matter of law, an assignee or intended third-party beneficiary stands in shoes of the contracting party and obtains no greater rights than could be asserted by that party. *Syufy Enterprises v. City of Oakland*, 104 Cal.App.4th 869, 888 (Cal. App. 1st 2002) (explaining that a third party beneficiary must take the contract as he finds it and "cannot assert greater rights than those of the promisee under the contract") (internal quotation marks and citation omitted); *Mercury Cas. Co. v. Maloney*, 113 Cal.App. 4th 799, 803 (Cal. Ct. App. 4th 2003) (A third-party beneficiary "cannot assert greater rights under the contract than those of the actual contracting party," nor can a third party "select the parts she finds advantageous and reject those she finds not to her liking."). As such, if DC Solar cannot enforce the "hell or high water provision" neither can STEFL. DC Solar cannot enforce the provision because it breached all of its obligations under each of its contracts with ISC and ISC terminated the Sublease and other contracts as a result. Pursuant to the cross-default and termination provisions contained in Addendum 1, ISC possessed a clear and unambiguous contractual right to terminate the Sublease for DC Solar's breach of its agreements.

Addendum 1 specifically provides that the "Sublease shall be deemed to be amended, with the following provisions." (Am. Compl. Ex. J, Doc. 30-10). Relying exclusively on provisions of the Master Lease and the Sublease Consent and Amendment signed only by DC Solar, not ISC, the Amended Complaint implies that ISC was somehow required to obtain STEFL's consent to amend its Sublease with DC Solar. The Amended Complaint repeatedly refers to provisions of

- 29 -

the Master Lease that allow DC Solar to enter into "permitted Subleases" with STEFL's prior written consent.  (*See* Am. Compl., Doc. 30 ¶¶ 10, 18-19).  The Amended Complaint thereafter alleges that it "did not consent to Addendum 1."  (*Id.*, ¶¶ 50, 61, 68).

ISC is not a party to the Master Lease and the Sublease does not require ISC to obtain STEFL's consent to any amendment or modification of that contract.  Paragraph 20 of the Sublease provides only that the Sublease "may not be modified or amended in any way, except by a writing signed by both Sublessor and Sublessee."  (Am. Compl. Ex. D, Doc. 30-4 ¶ 20).  Although STEFL's Master Lease may have required DC Solar to obtain its consent to amend the Sublease, STEFL did not include that requirement in the form Sublease it reviewed and approved for this transaction.  As discussed more fully above, ISC did not execute the Sublessee Acknowledgement whereby it might have assumed such an obligation to STEFL and STEFL was on actual notice of ISC's refusing to undertake such obligations.  It is equally undisputed that STEFL was in possession of the Sublease for weeks prior to its first closing with DC Solar, and that its counsel reviewed all of the provisions but included no provision regarding consent to amendments in the Sublease that ISC executed.  Although not actually alleged in the Amended Complaint, the implication alluded to in the Amended Complaint that ISC required STEFL's consent to amend the Sublease is inaccurate.

ISC also possessed the right to modify and amend the "hell or high water" provision in the Sublease.  A "hell or high water" provision can also be avoided if the sublessor to whom the promise runs (here, DC Solar) consents to cancellation of the Sublease.  *Info. Leasing Corp. v. GDR Investments, Inc.*, 152 Ohio App.3d 260, 266 (2003) (finding that where "the lessor [DC Solar in this context] may give, through word or conduct, the lessee consent to cancel an otherwise noncancelable lease" a "hell or high water" provision may not be enforceable); *Colonial Pac.*

- 30 -

*Leasing Corp. v. J.W.C.J.R. Corp.*, 977 P.2d 541, 548 (Utah Ct. App. 1999) ("We note that even the 'hell or high water' provision provides a mechanism by which a lessee can escape its harsh strictures . . . the consent of the party to whom the promise runs."). *See Blue Ridge Bank, Inc. v. City of Fairmont*, 807 S.E.2d 794, 800-01 (Va. 2017) (reiterating that "courts have found 'hell or high water' provisions unenforceable where the lessor consented to cancellation of the lease"). "It is well-established that: 'The hell or high water clause is not ... watertight'" in this regard. *Id.* at 800 (quoting Breslauer, "Finance Lease, Hell or High Water Clause, and Third Party Beneficiary Theory in Article 2A of the Uniform Commercial Code," 77 Cornell L. Rev. at 327).

DC Solar expressly consented to ISC's right to terminate the Sublease. The first relevant provision of Addendum 1 unambiguously provides that "Sublessee shall have the right to terminate the Sublease upon 30 days written notice to Sublessor if Sublessor fails to observe or perform any material obligation required by the Sublease." (Am. Compl. Ex. J, Doc 30-10 at 1 (designating provision as additional Sublease paragraph 22)). The second relevant clause clearly provides cross-default provisions upon which ISC's termination could also be based:

> **Cross-Default.** If Sublessor defaults on its obligations to Sublessee or to any affiliate, then and in that event, Sublessee, and any Sublessee affiliate with contractual relationships with Sublessor, in the sole discretion of each separate entity, shall be entitled to declare a cross-default on any other contracts or obligations Sublessor has with Sublessee or a Sublessee affiliate, as the case may be and seek all available remedies for such default, including but not limited to termination of such agreement. This includes but is not limited to the Sponsorship Agreement between Sublessor and Phoenix Speedway, LLC, the Marketing Agreement between Sublessor and Daytona International Speedway, LLC, the Sponsorship Agreement between Sublessor and Darlington Raceway of South Carolina, LLC and the 2018 Sponsorship Agreement (as defined below).

(*Id.* (designating provision as additional Sublease paragraph 23) (emphasis in original)). Finally, the Addendum unambiguously provides that "[i]n the event of a conflict between the terms and

provisions of this Addendum #1 and the terms and provisions the Sublease, this Addendum #1 shall control."  (*Id.* ¶ 2).

Such "hell or high water" provisions in equipment leases typically preclude a party from relying on a failure of the equipment to function as a basis to withhold rent payments, that provision was expressly modified by the parties to this Sublease.  *See, e.g.*, *C & J Vantage Leasing Co. v. Wolfe,* 795 N.W.2d 65, 75 (Iowa 2011) (reiterating that the provision requires "the lessee to continue to make full rent payments to the lessor even if the thing leased is unsuitable, defective, or destroyed") (quoting Black's Law Dictionary 742 (8th ed. 2004)); *see also Colorado Interstate*, 993 F.2d at 749 (holding provision enforceable regardless of whether "the property functions satisfactorily, is useful to the lessee, is suitable for the purposes intended, or is lost, stolen, condemned, or destroyed" (quoting 1 Bruce E. Fritch et. al., Equipment Leasing–Leveraged Leasing 152–53 (3d ed. 1988)).  However, the parties to this Sublease amended the provision to permit ISC to terminate the Sublease if DC Solar failed in its obligations under the Sublease, and it is undisputed that DC Solar breached those obligations.  *See generally* **Ex. 40** (Chitwood Decl.).

Plaintiff's contention that the addendum is not supported by consideration is without merit. Plaintiff acknowledges that the Addendum and sponsorship agreements cross referenced in it were "'part of the bargain struck between the parties concerning the Sublease.'"  (Am. Compl., Doc. 30 ¶ 63 (quoting Chitwood Decl. ¶ 44, attached hereto as Ex. 40)).  *See also* Cal. Civ. Code § 1614 (under California law, "[a] written instrument is presumptive evidence of a consideration.").  It was part of an entire contract relationship between DC Solar and ISC, and ISC's execution of the sponsorship and marketing agreements cross referenced in the Addendum are part of that consideration.  STEFL acknowledges this fact inasmuch as the Sublease and Addendum 1 were executed contemporaneously, and DC Solar requested that the provisions be placed in the

Addendum and not its form sublease template.  (*See* Am. Compl., Doc. 30 ¶¶ 52, 136).  Dep. of Benjamin Odom, ISC General Counsel, at 103:11-104:2, 129:11-131:3, **Ex. D-5.**  Moreover, separate consideration is not an absolute requirement where the parties and the contract contemplate such amendments as part of the agreement.  *DiFerdinando v. Intrexon Corp.*, No. 16-cv-01826-BTM-JMA, 2016 WL 6947060, *5 (S.D. Cal. Nov. 28, 2016); *Fennie v. E-Fuel Corp.*, No. 5:13-cv-04687-PSG, 2014 WL 1494370, *3 (N.D. Cal. April 16, 2014); *see LaRoss Partners, LLC v. Contact 911, Inc.*, 2015 WL 2452616 (E.D.N.Y. May 21, 2015) (quoting *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F.Supp.2d 652 (S.D.N.Y. 2008) (citations omitted)) (providing that "[w]hile consideration is required for a contract to be valid, '[m]odification to a contract [] need not be supported by additional consideration when the modification is in writing and signed by the party against whom it is sought to be enforced'").

It is also undisputed that DC Solar breached all of its agreements with ISC, including its obligations under the sponsorship and marketing agreements, when it ceased operations in December 2018 and failed to make any payments due under those agreements in January 2019.  *See generally* Ex. 40.  ISC sought relief from the stay in DC Solar's bankruptcy, and terminated the Sublease once the Bankruptcy Court granted it relief to do so.  *In re Double Jump, Inc., supra*, Dkt Nos. 174, 722. Ex. 39.   Upon terminating the Sublease, its obligations under that agreement were also terminated.  STEFL stands in no greater position than that of the original contracting party, DC Solar, with respect to an alleged right to rent payments.  It cannot collect rent that DC Solar could not collect as a result of DC Solar's total breach of its obligations under all of its agreements with ISC and the resulting termination of those agreements as ISC was contractually entitled to do.  There is no genuine dispute of material fact regarding these provisions, DC Solar's total breach or ISC's termination of the Sublease, and ISC is entitled to judgment as a matter of

law as to Count I of the Amended Complaint.  Inasmuch as STEFL's claims for declaratory relief arise out of fundamentally the same arguments seeking to declare Addendum 1 null and void, summary judgment should be granted as to Count II of the Amended Complaint as well.

### III.   STEFL is Not Entitled to the Contract Balance it Seeks Pursuant to an Unjust Enrichment Claim (Count III).

Although a party may plead the breach of an express contract and an equitable claim for unjust enrichment in the alternative, an unjust enrichment claim is subject to summary judgment where the parties' relationship is governed by an express contract.  In short, the existence of an express contract precludes an unjust enrichment claim as a matter of law.  *Weiss v. Benetton U.S.A. Corp.,* 124 A.D.3d 633, 636 (NY 2d Dept. 2015) (holding that the "Benetton defendants also established their prima facie entitlement to judgment as a matter of law dismissing the cause of action to recover damages for unjust enrichment, since express contracts, *albeit not between Weiss and Benetton USA* govern the subject matter at issue") (citations omitted); *Attebury Grain, LLC v. Grayn Co.,* 721 Fed. Appx. 669, 672 (9th Cir. 2018) (remanding case for dismissal of unjust enrichment claims against individuals as "as alter egos of or successors" of Superior Grain, a corn processing company, inasmuch as plaintiff's "relationship with Superior was defined by contract, so [plaintiff] cannot advance a quasi-contract action premised on Superior's breach of that contract").  This is the law of both California and New York that would be applied regardless of whether the jurisdictional provision of the Master Lease or the Sublease governs the claim.

STEFL claims that it is an assignee and third-party beneficiary of an express contract, the Sublease.  It seeks recovery for alleged breaches of that express agreement.  (Am. Compl., Doc. 30 at 25-28 (Count I)).  Both its breach-of-contract claim and its unjust enrichment claim seek the same contract damages.  (*Id*. at 25-28 (Count I), 31-33 (Count II)).  The matter is governed by an

- 34 -

expressed contract and ISC is entitled to judgment as a matter of law of for STEFL's unjust enrichment claim.  Therefore, summary judgment should be granted to ISC on Count III of the Amended Complaint as well.

## **CONCLUSION**

For all of the foregoing reasons, ISC is entitled to judgment as a matter of law as to STEFL's Amended Complaint in its entirety.

## **REQUEST FOR A HEARING**

Pursuant to Local Rule 3.01(j), ISC respectfully requests a hearing on the instant Motion and estimates that no more than 3 hours will be required for argument.

Respectfully submitted,

*/s/ Robert C. Folland*
Robert C. Folland (FL#1007951)
BARNES & THORNBURG LLP
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, FL  33418                      Donald A. Rea *(admitted pro hac vice)*
561-473-7560 (Telephone)                           Ashley N. Fellona *(admitted pro hac vice)*
561-473-7561 (Facsimile)                           SAUL EWING ARNSTEIN & LEHR LLP
Rob.Folland@btlaw.com                              500 East Pratt Street, Suite 900
                                                   Baltimore, MD 21202-3133
Mark R. Owens (*admitted pro hac vice*)            410-332-8680 (Telephone)
BARNES & THORNBURG LLP                             410-332-8862 (Facsimile)
11 South Meridian Street                           don.rea@saul.com
Indianapolis, IN, 46204-3535                       ashley.fellona@saul.com
317-231-7459 (Telephone)
317-231-7433 (Facsimile)                           *Counsel for Defendant/Counter-Plaintiff*
Mark.Owens@btlaw.com                               *International Speedway Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 15, 2021, a copy of the forgoing was filed with the Court and served on all parties of record via CM/ECF.

<u>*/s/ Robert C. Folland*</u>
Robert C. Folland

- 36 -